UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
LIONEL R. SMITH, PH.D,

                        Plaintiff,

-against-

  VERA INSTITUTE OF JUSTICE, INC.,

                        Defendant.
-----------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
21 CV 6430 (DG) (CLP)

**POLLAK**, United States Magistrate Judge:

On November 29, 2021, plaintiff Lionel R. Smith, Ph.D. ("plaintiff"), proceeding *pro se*,

commenced this action against Vera Institute of Justice, Inc. ("Vera" or "defendant"), alleging

*inter alia* multiple claims of disability discrimination, retaliation for, among other things, making

complaints about race discrimination, interference with rights under the Family and Medical

Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq., and failure to pay wage supplements.  (ECF No.

1).  On August 16, 2022, plaintiff filed an Amended Complaint against Vera, alleging 21 causes

of action, including *inter alia* multiple claims of race discrimination, disability discrimination,

and retaliation, in violation of federal, New York State, New York City, and Maryland state law.

(Am. Compl.[1]).

Currently pending before this Court on referral from the Honorable Diane Gujarati,

United States District Judge, is Vera's partial motion to dismiss.  (ECF No. 33, Electronic Order,

dated Mar. 8, 2023).  Defendant seeks dismissal of the following claims in the Amended

Complaint:  1) race discrimination, in violation of the New York State Human Rights Law

("NYSHRL"), N.Y. Exec. Law § 296 (Count 2), and in violation of the New York City Human

Rights Law ("NYCHRL"), N.Y. Comp. Codes R. & Regs. § 8-107 (Count 3); 2) wrongful

---

[1] Citations to "Am. Compl." refer to the Amended Complaint, filed on August 16, 2022.  (ECF No. 21).

discharge based on disability discrimination, in violation of the NYSHRL and the NYCHRL (Counts 5 and 6); 3) failure to provide a reasonable accommodation in violation of the NYSHRL and NYCHRL (Counts 8 and 9); 4) failure to engage in a cooperative dialogue to accommodate plaintiff's disability, in violation of the NYCHRL (Count 10); and 5) retaliation in violation of the NYSHRL, NYCHRL, and New York Labor Law ("NYLL") § 215 (Counts 13, 14, and 16). (Def.'s Mem.[2] at 1).

For the reasons set forth below, it is respectfully recommended that defendant's partial motion to dismiss be granted in part and denied in part.

## FACTUAL BACKGROUND

Plaintiff Smith holds a Ph.D. in Criminology, a M.A. in Social Sciences, and a B.A. in Urban Services Administration.  (Am. Compl. ¶ 15).  According to the Complaint, he is a Black man and a resident of Baltimore, Maryland.  (Id. ¶¶ 13, 14).  Plaintiff alleges that during the relevant time period, he was receiving treatment for multiple medical disabilities, including anxiety and ADHD.  (Id. ¶ 212).

On or about October 31, 2016, Smith began his employment at Vera as a Research Associate I within Vera's Center for Sentencing and Corrections ("CSC").  (Id. ¶ 43).  Defendant Vera is a not-for-profit corporation with its corporate office located at 34 35th Street, Suite 4-2A, Brooklyn, New York 112132.  (Id. ¶¶ 19, 21).  When Smith began his employment with Vera, he worked at Vera's corporate office in Brooklyn and lived in New York City.  (Id. ¶ 45).  By January 2018, plaintiff had relocated to Maryland, where Vera does not have a physical office, and began to work remotely.  (Id. ¶¶ 48, 49).  According to plaintiff, his "duty station" continued to be at Vera's office in New York City.  (Id. ¶ 50).  Plaintiff alleges that he continued to be

---

[2] Citations to "Def.'s Mem." refer to defendant's Memorandum of Law in Support of Defendant's Partial Motion to Dismiss First Amended Complaint, filed on December 2, 2022.  (ECF No. 34).

supervised by staff in New York City, he had daily interaction with staff in New York City, he traveled to New York City regularly for work-related meetings, and, aside from one work conference, none of his "work-related duties or assignments during his tenure at Vera were located in Maryland." (Id. ¶¶ 51, 52, 54, 55).  As an example, in or around February 2020, plaintiff traveled to New York City in conjunction with a work assignment "where he interacted with New York City residents and staff from the Brooklyn Public Library."  (Id. ¶ 141).  Plaintiff also alleges that both before and after he began working remotely in Maryland, his "Vera-issued corporate business card and his work email signature listed Vera's New York City corporate office as his business address," and listed a fax number that was connected to Vera's New York City Office.  (Id. ¶ 53).

A. Plaintiff Allegedly Suffers Racial Discrimination

For his performance review for the 2017 calendar year, plaintiff received a positive review and two salary increases:  a cost of living adjustment that was given to all eligible Vera staff and a performance-based merit increase.  (Id. ¶¶ 56, 57).[3]  In January 2018, Christian Henrichson, Research Director, became plaintiff's direct supervisor.  (Id. ¶ 63).  According to plaintiff, "[i]n or around this time, most of the other CSC researchers (none of whom were Black) received promotions approximately every year or year-and-a-half."  (Id. ¶ 64).  Plaintiff alleges that when he asked Mr. Henrichson what needed to be done for plaintiff to receive a promotion, Mr. Henrichson allegedly gave "nonsensical answers."  (Id. ¶ 65).  For example, Mr. Henrichson allegedly told plaintiff that he could earn a promotion by being first author on a report even though plaintiff had already been first author on a report.  (Id.)

---

[3] It is not clear from the Amended Complaint whether this performance review for the 2017 year, which occurred in March 2018 and was conducted by plaintiff's former supervisor, was held virtually or in-person at defendant's corporate office in Brooklyn.  (Am. Compl. ¶ 56).

In March 2019, plaintiff asked the Director of Human Resources to sit in on his performance review for the 2018 calendar year because he "was concerned Mr. Henrichson would not give him a fair and accurate 2018 performance review." (Id. ¶ 66). The Director told plaintiff to ask Mr. Henrichson if he approved of the Director attending the review. (Id. ¶ 67). According to plaintiff, when he had that conversation with Mr. Henrichson, Mr. Henrichson allegedly become "furious and berated" plaintiff. (Id.)

On March 15, 2019, plaintiff's 2018 performance review was held with Mr. Henrichson and ultimately, the Director also attended. (Id. ¶ 69).[4] As a result of the review, plaintiff was given the same two salary increases he had received the year before, and he was promoted from Research Associate I to Research Associate II. (Id.) Plaintiff complains that although he was promoted, it took him two and a half years as a Research Associate I before he received the promotion, while "similarly situated non-Black CSC researchers . . . who were promoted from Research Associate I to Research Associate II in or around 2018 and 2019 received their promotions much more quickly." (Id. ¶¶ 71–72). Also, according to plaintiff, plaintiff had a disproportionately larger workload, had worked at Vera longer, had more work experience prior to joining Vera, and had a higher level of educational attainment than those similarly situated non-Black researchers who were promoted from Research Associate I to Research Associate II in or around 2018 and 2019. (Id. ¶¶ 73–74).

On or about August 16, 2019, plaintiff met with Mr. Henrichson and the Director of Human Resources in Vera's New York City office to discuss an external job offer that plaintiff had received. (Id. ¶ 75). Plaintiff voiced his preference to continue working at Vera and asked to be promoted to the role of Senior Research Associate. (Id.) According to plaintiff, his

---

[4] It is not clear from the Amended Complaint whether this performance review for the 2018 year was held virtually or in-person at defendant's corporate office in New York City.

workload and level of responsibility was the same, if not larger, than that of the Senior Research Associates within CSC, none of whom were Black.  (Id. ¶ 76).  Plaintiff alleges that he even had more education, work experience, and tenure at Vera than some Senior Research Associates. (Id.)  Mr. Henrichson, however, rejected his request for a promotion.  (Id. ¶ 77).  Also, during this meeting in New York, the Director allegedly suggested that a "a change in supervisors for Dr. Smith should be explored due to the ongoing problems that Dr. Smith and Mr. Henrichson were having in their supervisor-supervisee relationship."  (Id. ¶ 78).

Following this meeting, plaintiff and Mr. Henrichson continued to discuss the terms of plaintiff's employment, "mostly via email," and plaintiff again requested a promotion, which Mr. Henrichson again rejected.  (Id. ¶ 79).  Instead, on or about September 5, 2019, plaintiff and Vera entered into a written agreement in which plaintiff alleges that he agreed to stay employed with Vera in part on the condition that Mr. Henrichson would recruit an intern to support plaintiff and restructure the weekly meetings between Mr. Henrichson and plaintiff.  (Id. ¶¶ 80, 81).[5]

Plaintiff alleges that around this same time period, he was discriminated against by Margaret diZerega, Project Director of the CSC.  Plaintiff alleges that Ms. diZerega repeatedly excluded plaintiff from development opportunities, assigned him a disproportionately larger workload, and chastised him for things that were beyond his control.  (Id. ¶ 92).  By contrast, plaintiff alleges that "Ms. diZerega assigned non-Black staff significantly less work, hired permanent employees to fill vacated positions to adequately support projects led by non-Black staff, provided personal support to complete projects led by non-Black staff, and routinely involved non-Black staff in professional development and other events and opportunities."  (Id. ¶ 93).

---

[5] However, according to plaintiff, as of December 2019, Mr. Henrichson did not fulfil any of his commitments related to the written agreement.  (Id. ¶ 113).

As an example of this disparate treatment, plaintiff alleges that on or about October 8, 2019, a staff member from the New York City Commission on Human Rights emailed both plaintiff and Ms. diZerega about a report that Vera had published.  (Id. ¶ 82).  According to plaintiff, although the email was primarily addressed to plaintiff as the primary author and principal investigator on the report in question, Ms. diZerega replied with her availability without consulting plaintiff in a way that "cut[] him out of the conversation as if he did not exist" and "deprived [him] of a chance to develop a new professional relationship with staff from a New York City-based government agency."  (Id. ¶¶ 83–85).  Moreover, while there were multiple events around this time focused on this same project, for which plaintiff was the lead author of the relevant report, Ms. diZerega did not invite plaintiff to any these events but instead, she invited a white staff member unrelated to this project to attend at least one such event.  (Id. ¶¶ 86–88).

In or around mid-October 2019, plaintiff submitted an internal complaint through a web-based platform about the racial discrimination he felt he had experienced from Ms. diZerega. (Id. ¶ 94).  Plaintiff then attended a virtual meeting with the Director of Human Resources in or around October 2019 and confirmed to her that he believed "that the adverse treatment that Ms. diZerega had subjected him to may have been due to race discrimination."  (Id. ¶¶ 95–96).  On or about November 25, 2019, as a follow up to this complaint, plaintiff was told by the Director in an email that she "'do[es] not think there will be a specific update there.'"  (Id. ¶ 104). According to plaintiff, "Vera did not investigate Dr. Smith's race discrimination complaint against Ms. diZerega."  (Id. ¶ 105).

In early December 2019, plaintiff alleges that Mr. Henrichson removed a white Senior Research Associate from the project that he and plaintiff had been working on, which left

plaintiff "solely responsible for completing the job duties of two (2) researchers on the Brooklyn Public Library project, which increased [plaintiff's] already disproportionately large workload vis-à-vis non-Black CSC researchers." (Id. ¶¶ 108, 110).  Additionally, plaintiff alleges that although plaintiff and this Senior Research Associate had been serving in the same role and sharing the same duties, plaintiff had the less-distinguished title.  (Id. ¶ 109).  According to plaintiff, "[t]his was a continuation of Mr. Henrichson's pattern of intentionally treating [plaintiff] less favorably than similarly situated non-Black CSC researchers."  (Id. ¶ 111).  On or about December 23, 2019, plaintiff made a formal complaint of race discrimination with SDHR against defendant.  (Id. ¶ 121).  Defendant allegedly received a copy of the formal complaint on January 30, 2020.  (Id. ¶ 122).

B.  Plaintiff Is Allegedly Retaliated Against

Plaintiff alleges that "[a]fter Vera became aware of Dr. Smith's SDHR Race Discrimination Complaint, numerous Vera staff members – some of whom were senior leaders and corporate officers – embarked on a deliberate and systematic effort to marginalize and malign Dr. Smith by subjecting him to a series of adverse actions that were both overt and subtle in nature."  (Id. ¶ 123).  For example, in February 2020, plaintiff, once again, did not receive a promotion to Senior Research Associate, while two white researchers with the title Research Associate II, with less education and less work experience than plaintiff, were promoted to Senior Research Associate.  (Id. ¶¶ 134–36, 139–40).  Plaintiff also alleges that "Vera promoted some non-Black research staff directly from Research Associate I to Senior Research Associate."  (Id. ¶ 137).

According to plaintiff, on March 5, 2020, Vera submitted its position statement on the plaintiff's SDHR race discrimination complaint through counsel, without "conduct[ing] an

investigation into the allegations that plaintiff made in his SDHR Race Discrimination Complaint." (Id. ¶¶ 142, 144). Plaintiff claims that there were multiple falsehoods in Vera's position statement and that the position statement served as "further evidence of the organization's racially biased treatment toward Dr. Smith." (Id. ¶¶ 146, 148, 149). For example, plaintiff alleges that, in its position statement, Vera characterized plaintiff's doctorate degree as a "'framed piece of paper,'" but "Vera praised non-Black researchers for having earned doctoral degrees." (Id. ¶ 147).

Just one day after Vera submitted its position statement, plaintiff alleges that another white researcher, with the title of Research Associate II, with less education and less work experience than plaintiff, was promoted to Senior Research Associate. (Id. ¶¶ 150, 151). According to plaintiff, "[f]ollowing this researcher's promotion on March 6, 2020, all of Mr. Henrichson's direct supervisees – except Dr. Smith: 1) were Senior Research Associates (or had some other senior-level title), and 2) were not Black." (Id. ¶ 152)

According to plaintiff, he began to feel ostracized at Vera after lodging the SDHR complaint. For example, plaintiff alleges that "[d]espite [plaintiff's] prior contributions to the In Our Backyards initiative, neither Mr. Henrichson nor anyone else at Vera invited [plaintiff] to attend this April 2020 symposium" for the initiative that was scheduled to take place in New York City. (Id. ¶¶ 163, 165). By contrast, plaintiff alleges that other researchers "who worked on this initiative – none of whom were Black – were invited to attend the symposium." (Id. ¶ 166).

As another example, plaintiff alleges that at his 2019 performance review held on May 6, 2020,[6] Mr. Henrichson invited Tracey Wilmot, the Director of Human Resources at the time, to

---

[6] It is not clear from the Amended Complaint whether this performance review for the 2019 year was held virtually or in-person at defendant's corporate office in Brooklyn.

join in plaintiff's review, which was not done for Mr. Henrichson's other supervisees.  (Id. ¶¶

177, 178).  At his performance review, Ms. Wilmot opined on plaintiff's performance, despite

not having personal knowledge of his performance and having only begun her employment with

Vera in or around the end of December 2019.  (Id. ¶ 180).  This suggested to plaintiff that Ms.

Wilmot "had been coached on what to say . . . in an attempt to legitimize the negative and

baseless critiques that were being made about Dr. Smith's 2019 work performance."  (Id. ¶ 181).

At the end of performance review, plaintiff expressed "his dissatisfaction . . . that some of the

meeting's agenda items were not discussed," and he "had many more questions about Mr.

Henrichson's unduly negative and incomplete review of Dr. Smith's 2019 performance."  (Id. ¶

187).  Mr. Henrichson, Ms. Wilmot, and plaintiff agreed that this discussion would be continued

in the coming weeks.  (Id.)  Plaintiff further alleges that, on May 9, 2020, he sent an email to Ms.

Wilmot asking to discuss work-related concerns but his email was ignored.  (Id. ¶¶ 189–90).

On or about May 19, 2020, Mr. Henrichson and Ms. Wilmot met with plaintiff "for what

was supposed to be the continuation of the May 6, 2020 discussion about Dr. Smith's 2019

performance review."  (Id. ¶ 191).[7]  During the meeting, plaintiff was placed on a performance

improvement plan or PIP.  (Id. ¶¶ 191–93).  Plaintiff alleges that Vera had never formally

warned plaintiff about his work performance prior to receiving the PIP and that the PIP "had

been concocted to punish Dr. Smith and to create an unwarranted, negative paper trail."  (Id. ¶¶

193–94).[8]  According to plaintiff, the PIP included a provision that if he could not demonstrate

improvement within 90 days, he would be terminated.  (Id. ¶ 204).  Also, in the meeting, plaintiff

alleges that Mr. Henrichson warned him that he was not sure if he would be able to secure future

---

[7] It is not clear from the Amended Complaint whether this May 19, 2020 meeting was held virtually or in-person at defendant's corporate office in Brooklyn.

[8] According to plaintiff, although the PIP was issued in May 2020, he learned that it had actually been drafted in February 2020.  (Am. Compl. ¶ 327).

funding for plaintiff's position.  (Id. ¶ 205).  At that time, plaintiff alleges that he told both Mr. Henrichson and Ms. Wilmot that he suffered from insomnia.  (Id. ¶ 207).  On or about May 27, 2020, plaintiff filed a formal complaint of retaliation with SDHR against Vera.  (Id. ¶ 211).

        C.   Plaintiff Suffers from Alleged Disability Discrimination and Further Retaliation

During 2019, plaintiff alleges that his "existing disabilities gradually became worse, and he started receiving treatment for additional disabilities that he was diagnosed with."  (Id. ¶ 213).  After the May 19, 2020 meeting, plaintiff did not sleep for five days and his health deteriorated.  (Id. ¶ 214).  On May 28, 2020 and June 1, 2020, plaintiff emailed Ms. Wilmot and Mr. Henrichson, seeking information about FMLA leave.  (Id. ¶¶ 215, 216).  On or about June 2, 2020, Ms. Wilmot responded to plaintiff's email, providing him with some information about FMLA leave, but she allegedly failed to provide him with the required New York State Disability Statement of Rights and "did not acknowledge plaintiff's request for information on reasonable accommodations in this email."  (Id. ¶ 220).  Also in her response, plaintiff alleges that Ms. Wilmot wrote:  "'As you are currently on a performance improvement plan, we reiterate that it is important that you deliver on the requirements of this 90-day plan that began on May 19, 2020.'"  (Id. ¶ 225).

Thereafter, plaintiff consulted with his medical provider who offered a "conservative estimate" of how frequently plaintiff would "experience flare-ups."  (Id. ¶ 228).  Based on this opinion and, because plaintiff feared he would face negative consequences if he did not return to work promptly in light of his PIP, plaintiff only requested four weeks of FMLA leave.  (Id. ¶¶ 228, 231).  On June 8, 2020, plaintiff submitted his FMLA form to Ms. Wilmot with a return-to-work date of June 22, 2020.  (Id. ¶¶ 232, 234).  He claims that he "would have also applied for short-term disability benefits, if Vera had provided him with a copy of the required New York

State Disability Benefits Statement of Rights notice." (Id. ¶¶ 233). Plaintiff also asserts that "once Vera received [his] completed FMLA Medical Certification Form . . . , the organization became aware of [his] medical disabilities and that some of his major life activities were substantially limited because of his medical disabilities," but nevertheless, "Vera did not contact [him] to discuss potential reasonable accommodation for his medical disabilities at any time after he returned to work on June 22, 2020." (Id. ¶¶ 235, 238–39).

On June 24, 2020, Vera allegedly became aware of plaintiff's SDHR retaliation complaint. (Id. ¶ 241). On June 29, 2020, plaintiff emailed his rebuttal to the PIP and his 2019 performance review to Mr. Henrichson and Ms. Wilmot. (Id. ¶ 242). In the body of the email, he wrote "that he considered the fraudulent PIP and his negative 2019 performance review as acts of retaliation against him because of the SDHR Race Discrimination Complaint that he filed against Vera in December 2019." (Id. ¶ 244). On July 2, 2020, plaintiff met virtually with Ms. Wilmot and Mr. Henrichson to discuss the PIP and plaintiff was allegedly reprimanded for "not completing work assignments that were due while he was out on FMLA leave." (Id. ¶ 245). Then, on July 9, 2020, plaintiff emailed Ms. Wilmot, Mr. Henrichson, and Latoya Walker, a Human Resources staff member, requesting to take additional FMLA leave immediately "[d]ue to a flare-up of his serious health conditions." (Id. ¶¶ 251, 252). Plaintiff alleges that he only requested a week and a half of FMLA leave because he was not aware of his FMLA rights and because he feared the consequences if he would not complete his PIP within ninety days. (Id. ¶ 255).

Also at this time, plaintiff alleges that he was eligible for the two salary increases made available to Vera employees: a general two-percent increase available to all eligible employees and a merit-based increase. (Id. ¶¶ 262, 264). According to plaintiff, these salary increases

would have been applied to eligible employees' paychecks on the first payroll period after April 29, 2020 and would have been retroactive to January 1, 2020. (Id. ¶ 263). However, plaintiff received neither of these increases and on or about July 13 or 14, 2020, plaintiff emailed Ms. Walker to alert her to this issue. (Id. ¶ 265). Ms. Walker and Ms. Wilmot allegedly provided false reasons unrelated to eligibility criteria to justify why plaintiff was ineligible for the salary increases. (Id. ¶¶ 266, 267). As to the merit salary increase, plaintiff believes that either Ms. diZerega made the decision to deny him the merit increase because this "was the first direct and most opportune time that she had to treat him adversely for filing an internal race discrimination complaint against her in October 2019," or that Ms. Wilmot made the decision because the denial "followed the pattern of adverse treatment that she had subjected him to during the preceding weeks and months." (Id. ¶¶ 269, 271, 272).

Also, on or about July 16, 2020, plaintiff made a second internal complaint of retaliation by emailing Vera's Chief Financial and Operations Officer and another Human Resources staff member, Cheryl Hill. (Id. ¶ 277). That same day, plaintiff emailed Vera's Human Resources staff to extend his FMLA leave until July 27, 2020. (Id. ¶ 278). The next day, on July 17, 2020, Vera's general counsel emailed plaintiff that she would be investigating his second internal retaliation complaint and they set up a phone call. (Id. ¶ 282). On or about July 24, 2020, plaintiff sent supporting documents related to the retaliation to Vera's general counsel. (Id. ¶ 291). Then, on or about July 25, 2020, Mr. Henrichson allegedly asked plaintiff for a meeting but did not state the reason for the meeting. (Id. ¶ 293). On or about July 27, 2020, Ms. Wilmot allegedly emailed plaintiff threatening his termination. (Id. ¶ 294). That same day, plaintiff emailed Ms. Hill that he would be extending his FMLA leave until August 3, 2020, and he would submit the necessary certification by August 3, 2020. (Id. ¶ 295). On or about July 28, 2020,

plaintiff replied to Ms. Wilmot's July 27, 2020 email threatening termination and copied Vera's general counsel to the email, adding that he hoped his retaliation complaint was being taken seriously by the counsel and was being investigated.  (Id. ¶ 299).

On August 3, 2020, plaintiff alleges that both Ms. Wilmot and Ms. Hill emailed plaintiff to notify him that he had been terminated effective that same day.  (Id. ¶¶ 301, 303).  Plaintiff alleges that "[a]t the time of [his] termination, he was in the process of completing the Brooklyn Public Library project, and he had plans to travel to New York City to conduct additional research for this project at a later date in 2020."  (Id. ¶ 311).  Also, plaintiff was in contact with a group within the New School in New York City about collaborating on a future work project related to their work with the Brooklyn Public Library.  (Id. ¶ 312).  Plaintiff alleges that on or about December 10, 2021, a faculty member from that group reached out to plaintiff and wrote: "I just sent you an email at your Vera Institute address and realize you are no longer there."  (Id. ¶ 341).  Further, plaintiff alleges that, after his termination, "Vera did not provide him with any information about his right to file an application for unemployment insurance benefits."  (Id. ¶ 315).  Shortly after his termination, plaintiff filed an unemployment insurance claim with the New York State Department of Labor but was allegedly told by the NYSDOL that he was ineligible for unemployment insurance.  (Id. ¶ 333).  Thereafter on or about September 9, 2020, plaintiff applied for unemployment benefits with the Maryland Department of Labor.  (Id. ¶ 334).

### D.  The Instant Motion

Following the filing of the Complaint on November 29, 2021, Vera filed a partial motion to dismiss in lieu of an answer on April 21, 2022.  (See ECF No. 15).  On July 14, 2022, plaintiff filed his first motion to amend the Complaint (ECF No. 19), which was unopposed and was

granted on August 2, 2022.  The Amended Complaint was filed on August 16, 2022, and on

September 14, 2022, defendant filed the instant partial motion to dismiss the Amended

Complaint.  (ECF Nos. 24, 33, 34).  Plaintiff opposed the motion on October 28, 2022 (ECF No.

36), and defendant filed a reply in further support of its motion on December 2, 2022.  (ECF No.

37).

In its motion, defendant seeks to dismiss ten causes of action brought under the

NYSHRL, NYCHRL, and NYLL because it argues that "[p]laintiff does not (because he cannot)

sufficiently allege that the impact of Vera's alleged misconduct was felt in New York State or

New York City."  (Def.'s Mem. at 1, 4).  Defendant argues that, because plaintiff did not

physically work in New York, "plaintiff must allege facts establishing that the impact of the

supposed discriminatory acts was felt within the boundaries of New York City or New York

State in order to state a claim under the NYCHRL and NYSHRL."  (Id. at 5 (citing Hoffman v

Parade Publ'ns, 15 N.Y.3d 285, 290, 933 N.E.2d 744, 746–47, 907 N.Y.S.2d 145, 147–48

(2010))).  Defendant further contends that plaintiff must make the same showing in order to avail

himself of the NYLL's protections.  (Id. at 7).

Defendant argues that plaintiff cannot demonstrate that the conduct underlying plaintiff's

discrimination and retaliation claims had an impact within New York because all of the conduct,

including the alleged promotions of less qualified non-Black candidates in 2018 and 2019 or

plaintiff's termination in 2020, occurred after plaintiff moved to Maryland.  (Id. at 8–9).

According to defendant, plaintiff's allegations that he was supervised by staff in New York City

and had the New York address listed on his business card and email signature, are insufficient to

satisfy the "impact test" required to entitle plaintiff to the protections of the NYSHRL,

NYCHRL, and the NYLL.  (Id. at 9).  Plaintiff's "speculation that he planned to work in New

York City more frequently . . . is likewise insufficient to overcome dismissal." (Id. at 10). Moreover, defendant argues that leave to amend should not be given because, here, plaintiff "had sufficient time to include all allegations that might lead to a different result in the [A]mended [C]omplaint, as he filed it nearly *four months* after defendant placed him on notice of his pleading deficiencies in its initial motion to dismiss." (Id. at 12).

In his response to defendant's partial motion to dismiss, plaintiff argues that an employee satisfies the impact requirement "when that employee is either denied an opportunity for employment in the City, or is treated as a New York City employee," irrespective of his residence. (Pl.'s Resp.[9] at 5–6). He contends that defendant's motion overlooks the allegations in his Amended Complaint that demonstrate how defendant's unlawful conduct had an impact in New York. (Id. at 6). For example, plaintiff points in part to his allegations that he was prevented from meeting with staff from the New York City Commission on Human Rights, from attending a symposium held in New York City, and from completing a project in New York City for a client in New York City. (Id. at 6–7). Plaintiff contends that "[a]rguably, all aspects of [his] employment connected him to Vera's offices in New York City." (Id. at 8). Additionally, plaintiff argues that defendant's personnel manual included a choice-of-law provision that indicated "that the laws of New York would apply to its employees, with some exceptions to employees that lived in certain states (Maryland not being among them)." (Id. at 11; see also Am. Compl. ¶ 120). Plaintiff also requests that should the Court grant defendant's motion to dismiss, he be given an opportunity to move to file a second amended complaint. (Pl.'s Resp. at 11).

---

[9] Citations to "Pl.'s Resp." refer to plaintiff's Memorandum of Law in Opposition to Defendant's Partial Motion to Dismiss, dated October 28, 2022. (ECF No. 36).

In reply, defendant stresses that plaintiff's "conclusory allegations regarding work he performed in New York or would have performed in New York cannot save the New York Claims from dismissal." (Reply[10] at 3). According to defendant, "'in order to have impact on the state or city of New York, a plaintiff must either live within the state of New York or New York City, or work there.'" (Id. at 3–4 (quoting Fukelman v. Delta Air Lines, Inc., No. 18 CV 2, 2020 WL 4587496, at *15 n.10 (E.D.N.Y. Apr. 13, 2020), report and recommendation adopted, 2020 WL 2781662 (E.D.N.Y. May 29, 2020), appeal dismissed, No. 20 CV 2057 (2d Cir. Sept. 25, 2020)). By contrast, defendant alleges that the cases plaintiff relies on in support are all distinguishable because at all times relevant to the underlying conduct, plaintiff was working in Maryland. (See id. at 6–8).

Defendant also attempts to clarify that the personnel manual's provision referring to New York Law "makes clear that it is solely intended to apply to leave periods," and so plaintiff's choice-of-law "argument holds no weight." (Id. at 8–9). Further, defendant asks the Court to reject plaintiff's request to file a Second Amended Complaint because "there is no indication that he can provide additional allegations that might lead to a different result." (Id. at 9).

DISCUSSION

I.    Legal Standard for Failure to State a Claim

Defendant moves to dismiss plaintiff's NYSHRL and NYCHRL claims for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[11] Under Rule

---

[10] Citations to "Reply" refer to defendant's Reply Memorandum of Law in Further Support of Defendant's Partial Motion to Dismiss First Amended Complaint, dated December 2, 2022. (ECF No. 37).

[11] Some defendants bring these motions to dismiss, challenging a nonresident plaintiff's ability to bring claims under NYSHRL and NYCHRL, as motions under Fed. R. Civ. P. 12(b)(1), rather than or in addition to Rule 12(b)(6). Compare Meilus v. Rest. Opportunities Ctr. United, Inc., No. 21 CV 2554, 2021 WL 4868557, at *1, 4 (S.D.N.Y. Oct. 15, 2021) (analyzing defendant's motion to dismiss brought pursuant to 12(b)(1) and 12(b)(6), based in part on the argument that plaintiffs' NYSHRL claims lacked subject matter jurisdiction because the plaintiffs did not live or work in the State of New York during the relevant time), with Downey v. Adloox Inc., 238 F. Supp. 3d 514, 519 n.2, 524 (S.D.N.Y. 2017) (explaining that, although defendants moved to dismiss the complaint under

12(b)(6), the Court must determine whether the plaintiff has "state[d] a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), the Court must accept as true the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff. DiFolco v. MSNBC Cable, LLC, 622 F.3d 104, 110–11 (2d Cir. 2010). To survive a motion to dismiss, "a complaint must contain 'enough facts to state a claim to relief that is plausible on its face.'" Biro v. Conde Nast, 807 F.3d 541, 544 (2d Cir. 2015) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)), cert. denied, 578 U.S. 976 (2016). A claim is sufficiently plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

This standard is not so stringent that the complaint is required to demonstrate probability, nor is it so lax that the complaint may plead only facts that show a mere possibility that plaintiff is entitled to relief or that are merely consistent with a defendant's liability. See id. Instead, a plaintiff must provide enough factual support that, if true, would "raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 555–56 (internal citations and footnote omitted). A court need not, however, accept the truth of legal conclusions or labels couched as factual allegations, see Papasan v. Allain, 478 U.S. 265, 286 (1986), and "'bald assertions and conclusions of law will not suffice.'" Amron v. Morgan Stanley Inv. Advisors, Inc., 464 F.3d 338, 344 (2d Cir. 2006) (quoting Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir. 1996)).

---

Rules 12(b)(6) and 12(b)(1), Rule 12(b)(1) was not relevant because defendants' arguments were not jurisdictional, even though one of those arguments was that the plaintiff could not satisfy the impact analysis under the NYSHRL and NYCHRL). Although defendant states at the beginning of its motion to dismiss that it seeks to dismiss plaintiff's claims pursuant to Rule 12(b)(1) and 12(b)(6) (Def.'s Mem at 1), defendant only provides the Court with the legal standard to apply to its motion under 12(b)(6). (Id. at 3–4). Since defendant here has styled its motion as one brought under Rule 12(b)(6), the Court has applied that standard in reviewing the current motion.

Ultimately, when the well-pleaded facts allow no more than an inference of a "mere possibility of misconduct" and the plaintiff has only alleged, rather than shown, an entitlement to relief, the federal pleading standard of Rule 8(a)(2) has not been satisfied.  Ashcroft v. Iqbal, 556 U.S. at 679.  However, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), abrogated on other grounds, Harlow v. Fitzgerald, 457 U.S. 800 (1982); accord Walker v. Schult, 717 F.3d 119, 124 (2d Cir. 2013).  Further, "where, as here, a plaintiff proceeds pro se, his pleadings 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'"  Shider v. Allied Universal Sec. Co., No. 21 CV 6425, 2023 WL 2652280, at *2 (E.D.N.Y. Mar. 27, 2023) (quoting Sykes v. Bank of Am., 723 F.3d 399, 403 (2d Cir. 2013)).  "A pro se complaint, 'however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'"  Id. (quoting Boykin v. KeyCorp, 521 F.3d 202, 213–14 (2d Cir. 2008)).

In considering a motion to dismiss, courts may take into account the following categories of documents:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents "integral" to the complaint and relied upon in it, even if not attached or incorporated by reference, [and] (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint . . . .

In re Merrill Lynch & Co., Inc., 273 F. Supp. 2d 351, 356–57 (S.D.N.Y. 2003) (internal footnotes omitted), aff'd sub nom. Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161 (2d Cir. 2005), cert. denied, 546 U.S. 935 (2005); see also Van Bourgondien-Langeveld v. Van Bourgondien, No. 10 CV 77, 2010 WL 5464890, at *3 (E.D.N.Y. Dec. 29, 2010) (quoting same).

With respect to the third category of documents that a court may consider, the Second Circuit has explained that such documents may be considered "when a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint." Cortec Indus., Inc. v. Sum Holding L.P., 949 F. 2d 42, 47 (2d Cir. 1991). In those circumstances, "the defendant may produce the [document] when attacking the complaint for its failure to state a claim, because plaintiff should not so easily be allowed to escape the consequences of its own failure." Id. When the defendant attaches documents to its motion papers that plaintiff had notice of and that plaintiff relied on when creating the complaint, the concerns which motivate converting a Rule 12(b)(6) motion into a Rule 56 motion are "largely dissipated." Id. at 48.

II.    Plaintiff's NYSHRL and NYCHRL Claims

A. Impact Analysis

Both the NYSHRL and the NYCHRL prohibit an employer from discriminating, firing or refusing to hire on the basis of race, creed, gender, disability, or other listed protected characteristic. See N.Y. Exec. Law § 296(1)(a); N.Y.C. Admin Code § 8-107(1)(a). The NYSHRL was passed "for the protection of the public welfare, health and peace of this state," and because the State Legislature had determined "that the state has the responsibility to act to assure that every individual within this state is afforded an equal opportunity." N.Y. Exec. Law § 290. The NYCHRL was passed based on the principle that "[i]n the city of New York, with its great cosmopolitan population, there is no greater danger to the health, morals, safety and

welfare of the city and its inhabitants than the existence of groups prejudiced against one another."  N.Y.C. Admin Code § 8-101.[12]

In Hoffman v. Parade Publications, the New York Court of Appeals held that both the NYSHRL and NYCHRL apply to nonresident plaintiffs who work in New York and New York City, respectively.  15 N.Y.3d at 290–92, 933 N.E. 2d at 747–48, 907 N.Y.S. 2d at 148–49.  The Court of Appeals determined that nonresident plaintiffs would need to "plead and prove that the alleged discriminatory conduct had an impact in New York" to qualify for relief under the NYSHRL, and that the conduct had an impact in the City to qualify for relief under the NYCHRL.  Id.  In so holding, the Court of Appeals rejected an alternate rule that nonresidents "need only plead and prove that the employer's decision to terminate was made in the city" or state.  Id.  In so doing, the New York Court of Appeals explained that an impact analysis would be "relatively simple for courts to apply and litigants to follow, lead[] to predictable results, and confine[] the protections of the [NYCHRL and NYSHRL] to those who are meant to be protected – those who work in the city."  Id., 15 N.Y.3d at 291, 933 N.E. 2d at 747, 907 N.Y.S. 2d at 148; see Mwangi v. Passbase, Inc., No. 21 CV 6728, 2022 WL 2133734, at *8 (S.D.N.Y. June 14, 2022) (explaining that "the Second Circuit has explicitly endorsed the impacts test") (citing Ware v. L-3 Vertex Aerospace, LLC, 833 F. App'x 357 (2d Cir. 2020) (summary order)).

Recently, the Second Circuit summarized the state of the law post-Hoffman in New York and in this Circuit.  Syeed v. Bloomberg L.P., 58 F.4th 64 (2d Cir. 2023).  Reviewing state court cases, the Circuit court explained:

> some cases have interpreted the impact requirement to "turn[] primarily on [the plaintiff's] physical location at the time of the alleged discriminatory acts," while others seem to have more

[12] According to the Administrative Code, the City of New York is defined as "[a]ll that territory within the city being all that territory contained within the boroughs of Manhattan, The Bronx, Brooklyn, Queens, and Staten Island."  N.Y.C. Admin Code § 2-201.

> broadly posited that a plaintiff can allege impact if he or she can show that the discriminatory acts affected "the terms, conditions[,] or extent of [his or her] employment . . . within the boundaries of New York."

Id. at 69 (alteration in original) (quoting Benham v. eCommission Sols, LLC, 989 N.Y.S.2d 20, 21, 118 A.D.3d 605, 606 (1st Dep't 2014), and Hardwick v. Auriemma, 983 N.Y.S.2d 509, 116 A.D.3d 465 (1st Dep't 2014)).  The Second Circuit also lamented that "[f]ederal courts have been no more conclusive."  Id.

Federal courts in this Circuit have echoed the pattern that the Second Circuit observed in the state courts when applying an impact analysis to a nonresident plaintiff's claims under the NYSHRL and NYCHRL.  "Courts look to where the impact occurs, not the place of its origination, to determine the location of the discriminatory acts, and the impact needs to be felt by the plaintiff in New York . . . ."  Shiber v. Centerview Partners LLC, No. 21 CV 3649, 2022 WL 1173433, at *3 (S.D.N.Y. Apr. 20, 2022); Pedroza v. Ralph Lauren Corp., No. 19 CV 8639, 2020 WL 4273988, at *2 (S.D.N.Y. July 24, 2020) (collecting cases).  "'Where the discriminatory conduct occurs outside the geographical bounds of New York . . . , courts have found that the impact requirement is satisfied if the plaintiff alleges that the conduct has affected the terms and conditions of the plaintiff's employment within [New York].'"  Amaya v. Ballyshear LLC, 340 F. Supp. 3d 215, 221 (E.D.N.Y. Nov. 20, 2018) (quoting Lambui v. Collins, No. 14 CV 6457, 2015 WL 5821589, at *5 (E.D.N.Y. Sept. 30, 2015)).[13]  Here, neither

---

[13] Cf. International Healthcare Exch., Inc. v. Global Healthcare Exch., 470 F. Supp. 2d 345, 353, 362–63 (S.D.N.Y. 2007) (denying summary judgment on a plaintiff's NYSHRL and NYCHRL discrimination claims where she worked out of a home office in New York City for a company based out of Chicago and argued that she was disproportionately assigned administrative work due to gender discrimination and the court there held that "the alleged discriminatory acts affected the terms and conditions of her employment at her workplace in New York City").

plaintiff nor defendant argues that the alleged discriminatory conduct originated outside of New York.[14]

Instead, the parties disagree as to whether the alleged discriminatory conduct had an impact on plaintiff in New York. Courts have held that where the discriminatory conduct occurs in New York and the plaintiff experiences the impact of that conduct while in New York, even though the plaintiff is a nonresident, an action under the NYSHRL and NYCHRL will lie. See, e.g., Desiderio v. Hudson Techs., Inc., No. 22 CV 541, 2023 WL 185497, at *5–7 (S.D.N.Y. Jan. 13, 2023). Under the impact analysis, a nonresident plaintiff's contact with New York must not simply be "tangential," such as "a non-resident plaintiff's occasional meetings in or travel to [New York]." Shiber v. Centerview Partners LLC, 2022 WL 1173433, at *3 (citing Hoffman v. Parade Publ'ns, 15 N.Y.3d at 292, 933 N.E. 2d at 748, 907 N.Y.S. 2d at 149). Instead, in order to be relevant to the impact analysis, plaintiff's contact with New York should be directly related to the alleged discrimination suffered. See Meilus v. Restaurant Opportunities Ctr. United, Inc., No. 21 CV 2554, 2021 WL 4868557, at *10 (S.D.N.Y. Oct. 15, 2021) (holding that "[t]he issue in evaluating whether or not to dismiss these NYSHRL claims is not whether Plaintiffs' claims 'stem from' New York-based discriminatory conduct, but whether the impact of the contested employment action was *felt by Plaintiffs in* New York"). For example, in Desiderio v. Hudson Technologies, Inc., a nonresident plaintiff living in Florida, who "worked remotely during the COVID-19 pandemic," alleged that during a meeting in Long Island City, Queens, she endured "harsh treatment at the hands of [defendant's President and CEO], which she describe[d] as motivated by gender discrimination." 2023 WL 185497, at *5. The court there found that

---

[14] When discussing plaintiff's case, this Court will refer to New York City and New York State as "New York" because there have been no arguments raised to suggest that the impact of the conduct may have been felt in New York State but not New York City.

because plaintiff "allege[d] that she *did* attend a meeting at her employer's New York City office at which she experienced gender-based discriminatory treatment," and she alleged "that she felt the impact of the discriminatory conduct" at that meeting, her NYSHRL and NYCHRL claims could proceed.  Id. at *6.

Additionally, the critical impact is the one felt by *plaintiff* as a result of the discriminatory conduct and not any impact felt by third parties.  Vangas v. Montefiore Med. Ctr., 823 F.3d 174, 183 (2d Cir. 2016) (explaining that "the impact of the employment action must be felt *by the plaintiff* in [New York]" and not those that plaintiff interacted with in the course of her employment); Doner-Henrick v. New York Inst. of Tech., No. 11 CV 121, 2011 WL 2652460, at *8 (S.D.N.Y. July 6, 2011) (explaining that "[t]he relevant 'impact' within the State that a plaintiff must plead (and later prove) is the direct effect of a discriminatory act on a protected individual – giving rise to a cause of action for that individual – not the attenuated reaction of third parties to such an individual's circumstance").

 For example, in Meilus v. Restaurant Opportunities Center United, Inc., the court rejected one of the plaintiffs' argument that her attendance at a mandatory event in New York, where discriminatory conduct occurred, was sufficient to demonstrate impact under the NYSHRL, explaining that "the allegations about what occurred at [the event in New York] involve general attitudinal discrimination toward African Americans, but do not include any discriminatory actions specifically directed toward [plaintiff] herself."  2021 WL 4868557, at *11.  In other words, in undertaking its impact analysis, the court in Meilus was exacting in evaluating whether plaintiff and not some related or third party felt the impact of the discrimination within New York.

On the other hand, consistent with the holding in <u>Desiderio</u>, the court in <u>Meilus</u> explained that "'[t]o the degree incidents of harassment or retaliation occurred while [plaintiff] was in New York City, the Court sees no reason those claims cannot proceed.'"  <u>Id.</u> (quoting <u>Kraiem v. JonesTrading Institutional Servs. LLC</u>, 492 F. Supp. 3d 184, 200 (S.D.N.Y 2020), but ultimately determining that the complaint did not contain any allegations of such incidents; <u>see also</u> <u>Kraiem v. JonesTrading Institutional Servs. LLC</u>, 492 F. Supp. 3d at 200, 205 (granting in part defendants' motion to dismiss nonresident plaintiff's discrimination and retaliation claims under the NYSHRL and NYCHRL except as to those claims "based on events during a 2017 business trip to New York City").

## B.  Race Discrimination

In alleging claims of race discrimination, plaintiff Smith points to, *inter alia*, the fact that he was assigned a disproportionate workload and "less desirable job duties" compared to other non-Black employees (<u>see, e.g.</u>, Am. Compl. ¶¶ 73, 92–93, 353), that he was excluded from networking and presentation opportunities to which non-Black employees were invited (<u>see, e.g.</u>, <u>id.</u> ¶¶ 82–88, 98–101, 163–66), that he was disciplined "more harshly and swiftly" as compared to non-Black staff (<u>see, e.g.</u>, ¶¶ 193, 194, 353), and that he was passed over for promotional opportunities when non-Black employees with lesser experience received promotions.  (<u>See, e.g.</u>, <u>id.</u> ¶¶ 76, 77, 79, 150–53).  In asserting that the impact of defendant's discriminatory conduct occurred in New York, plaintiff highlights several facts, including that he was supervised out of New York, he worked on projects in New York, he occasionally traveled to New York for meetings, he was prevented from attending a symposium held in New York, and he was prevented from communicating with a stakeholder in New York.  (<u>See</u> Pl.'s Resp. 6; Am. Compl. ¶¶ 51–54).

24

These facts alone are not sufficient to demonstrate the type of impact necessary to bring claims under the NYSHRL and NYCHRL.  Conversing with supervisors located in New York and travel to New York for meetings or work unrelated to the alleged discriminatory conduct are insufficient for the impact analysis.  See Amaya v. Ballyshear, 340 F. Supp. 3d at 222 (rejecting plaintiff's arguments that because she attended meetings in New York City and interacted with supervisors in New York City she could avail herself of the NYCHRL, where plaintiff lived and worked on Long Island).  Also, although plaintiff argues that he was prevented from responding to a New York contact due to discrimination (see Am. Compl. ¶¶ 82–85), the case law makes clear that the relevant impact for the impact analysis is that on the plaintiff and not on work contacts.  Vangas v. Montefiore Med. Ctr., 823 F.3d at 183 (holding that "[u]nder the NYCHRL the impact of the employment action must be felt *by the plaintiff* in NYC" and "[t]o hold otherwise, such that the NYCHRL would cover employees who work at call centers outside the city and whose only contacts with NYC are phone conversations with persons in the city, would broaden the statute impermissibly beyond those 'who work in the city'").

Additionally, plaintiff alleges several instances in which he was not promoted while less experienced, white candidates were.  (See, e.g., Am. Compl. ¶¶ 76, 77, 79, 150–53).  One of the key allegations related to plaintiff's failure to promote claims involves an in-person meeting on August 16, 2019, where plaintiff met with Mr. Henrichson, and the then-Director of Human Resources in defendant's New York City office.  (Id. ¶ 75).  At this meeting, plaintiff requested a promotion, which was denied orally at the time by Mr. Henrichson.  (Id. ¶ 77).  According to plaintiff, at that point, "he was performing the same, if not higher, level of duties as compared to Senior Research Associates within CSC (none of whom were Black)."  (Id. ¶ 76).  Also at this meeting, plaintiff alleges that the then-Director of Human Resources "suggested that a change in

supervisors for Dr. Smith should be explored, due to the ongoing problems that Dr. Smith and Mr. Henrichson were having in their supervisor-supervisee relationship." (Id. ¶ 78). In other words, the tension between Dr. Smith and his supervisor Mr. Henrichson was so apparent to this third party that the third party suggested that they be separated.

Altogether, plaintiff has alleged sufficient facts to suggest that he was disparately treated on the basis of his race during this meeting and that he felt the impact of that treatment immediately in defendant's corporate office in New York City. Under the theory articulated in cases like Desiderio, Meilus, and Kraiem, because the plaintiff was in New York City at the time of the alleged racial discriminatory conduct and he felt the impact of that discrimination while he was in New York, plaintiff should be allowed to proceed on his claims for racial discrimination under the NYSHRL and NYCHRL. This Court finds that plaintiff has alleged enough of an impact in New York to satisfy the impact analysis with respect to his claims of race discrimination. Therefore, this Court respectfully recommends that defendant's motion to dismiss Counts 2 and 3 be denied.

C. Retaliation

As with claims of disparate treatment, courts apply the impact analysis to nonresident plaintiffs' claims of retaliation under the NYSHRL and NYCHRL. Fried v. LVI Servs., Inc., 500 F. App'x 39, 42 (2d Cir. 2012) (affirming the district court's grant of summary judgment for defendants on a nonresident plaintiff's claims of age discrimination and retaliation in violation of NYCHRL because plaintiff could not satisfy the impact requirement under Hoffman) (summary order); see also Kraiem v. JonesTrading Institutional Servs. LLC, 492 F. Supp. 3d at 199 (explaining that "[f]or this Court to have subject matter jurisdiction over [plaintiff's] claim under NYSHRL and NYCHRL the alleged discrimination and retaliation must have had an impact on

her in New York State and City respectively").  Here, plaintiff also alleges claims of retaliation under the NYSHRL and NYCHRL – namely, that the defendant "retaliate[ed] against him because he engaged in multiple types of protected activity including, but not limited to, filing multiple formal complaints of race discrimination and retaliation."  (Am. Compl. ¶¶ 416, 420).

In approximately mid-October 2019, plaintiff submitted an internal complaint of race discrimination against Ms. diZerega and had a virtual meeting with Human Resources that same month in which he reiterated that he believed Ms. diZerega was discriminating against him on the basis of his race.  (Id. ¶¶ 94–96).  On December 23, 2019, plaintiff filed his race discrimination complaint with the New York State Division on Human Rights, and he alleges that defendant became aware of the complaint on January 30, 2020.  (Id. ¶¶ 121, 122). [15] Plaintiff alleges that after defendant became aware of the complaint, it "embarked on a deliberate and systematic effort to marginalize and malign Dr. Smith by subjecting him to a series of adverse actions that were both overt and subtle in nature."  (Id. ¶ 123).  According to plaintiff, some of defendants' retaliatory acts included "denying Plaintiff professional development opportunities," "denying Plaintiff funding opportunities," "subjecting Plaintiff to unwarranted discipline" "knowingly providing false information about Plaintiff to the SDHR and the EEOC," "denying Plaintiff a promotion," "placing Plaintiff on a fraudulent and disciplinary PIP," "ignoring Plaintiff's requests for assistance to resolve his workplace concerns," "ostracizing Plaintiff," "preventing Plaintiff from participating in staff meetings," "terminating Plaintiff's

---

[15] Additionally, on May 27, 2020, plaintiff "filed a complaint of unlawful retaliation with the SDHR against Vera."  (Am. Compl. ¶ 211).  On May 28, 2020, plaintiff emailed Ms. Wilmot and Mr. Henrichson seeking information about FMLA leave and reasonable accommodations.  (Id. ¶ 215).  On June 29, 2020, plaintiff emailed Mr. Henrichson and Ms. Wilmot that "he considered the fraudulent PIP and his negative 2019 performance review as acts of retaliation against him because of the SDHR Race Discrimination Complaint that he filed against Vera in December 2019."  (Id. ¶ 244).  Then, on July 16, 2020, plaintiff made a second internal complaint of retaliation by emailing Vera's Chief Financial Officer and Chief Operations Officer.  (Id. ¶ 277).

employment," and "failing to provide Plaintiff with accurate information about applying for short-term disability insurance . . . [and] unemployment insurance benefits."  (Id. ¶ 411).[16]

The Amended Complaint suggests that most of these retaliatory acts occurred remotely, presumably while plaintiff was working from home in Maryland.  For example, plaintiff alleges that he was denied the opportunity to seek a grant over email (id. ¶ 138), that he was prevented from participating in a Zoom staff meeting when he was not transferred to a breakout room (id. ¶¶ 247–48), that his requests for assistance, which often originated by email, went ignored (id. ¶ 94, 104, 189–90), and that he was terminated by email without an exit interview.  (Id. ¶¶ 301–05).  Remote interactions while the plaintiff is not in New York are certainly insufficient to satisfy the impact analysis. [17]  See Johnson v. Everyrealm, Inc., No. 22 CV 6669, 2023 WL 2216173, at *16 (S.D.N.Y. Feb. 24, 2023) (explaining that because the case therein involved "face-to-face harassment in New York City between the alleged harasser and a plaintiff who had ongoing part-time work responsibilities in the City, [it was] thus a very far cry from those dismissing NYCHRL claims where out-of-state plaintiffs remotely interacted with third parties

---

[16] In plaintiff's response to defendants' motion to dismiss, he alleges that he can satisfy the impact analysis in part based on the fact that he "was not provided information on how to properly apply for short-term disability benefits as mandated by New York State law" and "was not provided with information on applying for unemployment insurance benefits as mandated by New York State law."  (Pl.'s Resp. at 6–7).  The Court disagrees that these allegations suffice to demonstrate impact.  Assuming arguendo that plaintiff was entitled to New York short-term disability benefits, it is unclear based on the Amended Complaint how not receiving these benefits had an impact on plaintiff within New York.  Similarly, although he alleges that he was deprived of information about unemployment benefits, plaintiff ultimately applied for New York unemployment insurance and was told "that he was ineligible to obtain unemployment insurance benefits from the NYSDOL."  (Am. Compl. ¶ 333).  Therefore, it is unclear how not receiving information about those benefits impacted plaintiff within New York.

[17] In Downey v. Adloox Inc., even though the court could not discern where the termination email was received because plaintiff lived in Connecticut but worked in New York, it still allowed the plaintiff to pursue his age discrimination claims because there were no other competing job locations, no allegations that plaintiff worked remotely from home, and his claims were "based in part on his treatment during his employment."  238 F. Supp. 3d at 524.  Here, plaintiff alleges that he lived in Maryland, and primarily worked in Maryland during the relevant period, so common sense suggests that where plaintiff does not allege otherwise, his virtual meetings and email conversations occurred while he was working in Maryland.  However, if plaintiff were able to plead additional facts demonstrating that the discriminatory acts would have a New York impact, such as where he was when he was told certain things or received relevant emails, the Court respectfully recommends that he be given an opportunity to supplement his pleadings.

or defendants based in New York City"); see also Mwangi v. Passbase, Inc., 2022 WL 2133734, at *8 (dismissing plaintiff's NYCHRL and NYSHRL claims because "even if the [discriminatory] acts themselves occurred in New York, their impact was not felt in New York, because [plaintiff] was at all times in Berlin"); Kraiem v. JonesTrading Institutional Servs. LLC, 492 F. Supp. 3d at 199 (explaining that "[t]he Second Circuit has . . . rejected arguments that impact may be established by interactions with people in New York while the Plaintiff is elsewhere").  Without any additional allegations to suggest that any of the actions were experienced by plaintiff while he was in New York or otherwise impacted plaintiff in New York, such conduct is insufficient to satisfy the impact analysis.  See Mayer v. Neurological Surgery, P.C., No. 15 CV 864, 2015 WL 13738361, at *6–7 (E.D.N.Y. Dec. 21, 2015) (recommending dismissal of plaintiff's claims of discrimination and retaliation under the NYCHRL without prejudice where plaintiff worked both in New York City and Nassau County but her complaint failed to identify any particular discriminatory or retaliatory acts that occurred in New York City so she could not establish the impact of defendants' conduct occurred in New York City), report and recommendation adopted, 2016 WL 347329 (E.D.N.Y. Jan. 28, 2016).

Also, as a consequence of his allegedly retaliatory termination, plaintiff alleges that he was prevented from finishing a work-related project, from traveling to New York to conduct research for defendant, from developing new projects for defendant with New York collaborators, and from connecting further with a collaborator who sought him out after he was terminated.  (Am. Compl. ¶¶ 311, 312, 341).  This alleged impact, while felt by colleagues and clientele in New York, was not felt by *plaintiff* in New York.  For the purpose of the impact analysis, as previously mentioned, courts in this Circuit have made it clear that the key discriminatory impact is that felt by the *plaintiff* in New York, not by work contacts, which

29

would otherwise greatly expand the reach of these provisions.  See Doner-Hendrick v. New York Inst. of Tech, 2011 WL 2652460, at *8 (rejecting plaintiff's claims under the NYSHRL because "[p]laintiff's only allegation of an impact in New York is that plaintiff's termination 'certainly [had] a profound impact on the entire faculty,' including those in New York," and finding that "[t]he relevant 'impact' within the State that a plaintiff must plead (and later prove) is the direct effect of a discriminatory act on a protected individual").  Additionally, any argument that plaintiff's termination inhibited his development of further or new career opportunities in New York is too speculative to establish an impact in New York.  See Kraiem v. JonesTrading Institutional Servs. LLC, 492 F. Supp. at 199 (explaining that "[p]leading impact in New York City by unspecified future career prospects would . . . represent a[n] . . . impermissible broadening of the scope of [the NYSHRL and NYCHRL]" because "[i]f impact can be shown by a mere hope to work in New York down the line, the flood gates would be open").[18]

Accordingly, the Court respectfully recommends that defendant's motion to dismiss be granted as to Counts 13 and 14.  However, in light of plaintiff's *pro se* status, the Court respectfully recommends that Counts 13 and 14 be dismissed without prejudice because the plaintiff may be able to demonstrate the requisite impact by alleging additional facts.

### D.  Disability Discrimination

With respect to plaintiff's claims related to disability discrimination, plaintiff alleges that defendants failed to engage him in a cooperative dialogue to accommodate his disability (Count 10), failed to accommodate his disability (Counts 8 and 9), and discriminatorily discharged him (Counts 5 and 6).

---

[18] In Kraiem v. JonesTrading Institutional Services LLC, the court distinguished plaintiff's claims of impact from the impact alleged in cases like Anderson v. HotelsAB, LLC, No. 15 CV 712, 2015 WL 5008771 (S.D.N.Y. Aug. 24, 2015), which involved failure to hire claims "where the impact of the plaintiff was specifically tied to their being deprived a job in New York on discriminatory grounds."  492 F. Supp. 3d at 199.

Plaintiff alleges that during his May 19, 2020 PIP meeting, plaintiff informed Mr.
Henrichson and Ms. Wilmot that he suffered from insomnia.  (Am. Compl. ¶ 207).  Thus, it
appears that the first opportunity for defendants to accommodate plaintiff occurred in that May
19, 2020 meeting.[19]  Further, plaintiff alleges that following the meeting, he was "apoplectic and
deeply disturbed," that he "did not sleep for approximately five (5) consecutive days after," and
"was unable to function well."  (Id. ¶¶ 208, 214).  Unfortunately, there are no allegations in the
Amended Complaint to indicate whether this PIP meeting, or any performance review meeting
for that matter, took place in person in New York or remotely.  (See id. ¶¶ 69 (the 2018
performance review), 179–87 (the 2019 performance review), 191–207 (the May 19, 2020
meeting)).

In Desiderio v. Hudson Technologies, Inc., in addition to the plaintiff's claim of gender
discrimination previously discussed, plaintiff also brought a claim of disability discrimination.
Desiderio alleged that "in the weeks that followed" the meeting in Long Island City, Queens in
which she felt defendant's treatment toward her was motivated by gender discrimination, she
"began suffering from, and was diagnosed with, panic attacks, anxiety, depression, and
insomnia."  Desiderio v. Hudson Techs., Inc., 2023 WL 185497, at *2.  The court there held that
unlike her claims for gender discrimination, her claims under the NYSHRL and NYCHRL for
disability discrimination should be dismissed because there was no support for the claim that she
experienced the impact of the discrimination while she was in New York since her medical
conditions began after she returned to her home in Florida.  Id. at *7.  Unlike the plaintiff in
Desiderio, plaintiff here has alleged that he *immediately* felt the impact of defendant's alleged

---

[19] Although plaintiff alleged that he had been receiving treatment for various medical disabilities since
2017 and that his disabilities worsened in the middle of 2019 (Am. Compl. ¶¶ 212, 213), plaintiff does not allege
that anyone at Vera had notice of these disabilities until May 19, 2020.

disability discrimination during that May 19, 2020 meeting.  However, without information about whether this meeting occurred in New York, with plaintiff physically present, the Court cannot find that plaintiff has sufficiently alleged that the impact of the disability discrimination was felt in New York.

Plaintiff's Amended Complaint contains additional allegations related to requests for reasonable accommodations, but they are similarly deficient in establishing the location of impact.  Plaintiff's requests for FMLA leave and for reasonable accommodations following the May 19, 2020 meeting occurred via email with Vera staff, while plaintiff was presumably in Maryland.  (See, e.g., Am. Compl. ¶¶ 215, 220, 232).  For the reasons already discussed with respect to plaintiff's alleged retaliatory acts that occurred remotely, such allegations, without more, are insufficient to demonstrate an impact on plaintiff within New York.[20]

Therefore, in the absence of allegations that the disability discrimination impacted plaintiff in New York, he cannot bring these claims under the NYSHRL and NYCHRL, and the Court respectfully recommends that Counts 8, 9, and 10 be dismissed without prejudice.  Given plaintiff's pro se status, the Court respectfully recommends that plaintiff be given an opportunity to allege additional information in accordance with this analysis.

Plaintiff also argues that he was discriminatorily discharged on the basis of his disability (Counts 5 and 6).  However, as discussed in the context of plaintiff's retaliation claims, his remote termination and his inability to connect further with New York contacts and New York work projects are insufficient to satisfy the impact analysis.  Therefore, the Court finds that the

---

[20] Plaintiff actually does not allege any specific contacts in New York after this May 19, 2020 meeting. The last specific physical contact plaintiff alleges is a work trip to the Brooklyn Public Library in or around February 2020.  (Am. Compl. ¶ 141).

plaintiff has failed to demonstrate that his claims of discriminatory discharge had an impact on him within New York.

Accordingly, the Court respectfully recommends that defendant's motion to dismiss Counts 5 and 6 be granted, but without prejudice so that if plaintiff can allege in good faith that the impact was felt by him in New York, he be given the opportunity to amend.

III.    Plaintiff's NYLL Claim

In Count 16, plaintiff alleges that defendant violated plaintiff's rights under the NYLL "by retaliating against him because he reported that he was not paid a promised wage supplement (i.e., a two-percent general salary increase in 2020)" when defendant "terminated Plaintiff's employment less than one (1) month after he complained about the missing wage supplement." (Am. Compl. ¶¶ 432, 433).  According to plaintiff, he was supposed to receive this wage supplement "on the first payroll after April 29, 2020 (retroactive to January 1, 2020)," and he complained about not having received the supplement by email on or about July 13 or 14, 2020. (Id. ¶¶ 263, 265).  In its motion to dismiss, defendant argues that plaintiff fails to state a claim under the NYLL because "plaintiffs must work within the State of New York in order to avail themselves of protection under the [NYLL]."  (Def.'s Mem. at 7–8).

Courts in this Circuit have held that the NYLL does not apply extraterritorially to work performed outside of New York.  In re Stage Presence Inc., No. 12 CV 10525, 2019 WL 2004030, at *10 (S.D.N.Y. May 7, 2019) (collecting cases) (affirming the bankruptcy court's dismissal of plaintiffs' NYLL claims where they lived in New York and were hired in New York by a New York corporation but performed work in Washington D.C.);[21] see also Jian Ping Lin v.

_____

[21] Of note, the bankruptcy court in its decision rejected the argument by the plaintiffs in the adversary proceeding that the court should apply Hoffman's impact analysis to the NYLL, because "[t]o the Court's knowledge, no decision of any New York State or federal court has applied Hoffman in this way or has given such

Monda Window & Door Sys, Inc., No. 17 CV 3737, 2018 WL 4403384, at *4 (E.D.N.Y. Aug. 7, 2018) (holding that "Plaintiff cannot recover under NYLL for work performed entirely in another state"), report and recommendation adopted, 2018 WL 4388450, (E.D.N.Y. Sept. 13, 2018); Klapakis v. AMK Contr. Corp., No. 14 CV 4806, 2017 U.S. Dist. LEXIS 109036, at *10 (E.D.N.Y. May 17, 2017) (explaining that "several courts within the Second Circuit have declined to apply [the NYLL] extraterritorially") (collecting cases); O'Neill v. Mermaid Touring Inc., 968 F. Supp. 2d 572, 578–79 (S.D.N.Y. 2013) (explaining that the purpose of the NYLL is "'clearly to protect workers laboring in New York,'" and that "'[n]othing in the statute suggests that the legislators intended to give persons who were outside New York the right to come to New York to sue their employers'") (quoting Hammell v. Paribas, No. 90 CV 4799, 1993 WL 426844, at *1 (S.D.N.Y. Oct. 22, 1993)).

While "the presumption against extraterritorial application of the NYLL does not control in all circumstances," Solouk v. European Copper Specialties, Inc., No. 14 CV 8954, 2019 WL 2181910,  at *16 (S.D.N.Y. May 2, 2019), there is no question that plaintiff here seeks protection from the NYLL for alleged acts of retaliation that occurred in July and August 2020 and there are no allegations in the Amended Complaint placing plaintiff in New York during those months. Cf. Drozd v. U.S.A. Concepts of N.Y. Corp., No. 09 CV 5120, 2015 WL 13733713, at *11–12 (E.D.N.Y. Apr. 23, 2015) (finding, where plaintiffs worked in both New Jersey and New York, they were not entitled to damages under the NYLL for work performed in New Jersey, but were entitled to damages for work performed in Manhattan even where one plaintiff only alleged he worked ten days in Manhattan).  Notably, plaintiff only alleges one specific work trip to New

---

extraterritorial effect to the New York Labor Law." In re Stage Presence Inc., 559 B.R. 93, 99–100 (S.D.N.Y. 2016).

York in 2020, and that was in or around February 2020 when he traveled to New York City for research on the Brooklyn Public Library Project.  (Am. Compl. ¶ 141).

Therefore, the Court respectfully recommends that the defendant's motion to dismiss Count 16 be granted without prejudice in the event that plaintiff can allege specific facts demonstrating that he seeks protection under the NYLL for work performed in New York.

IV.    <u>Contract Provision</u>

Plaintiff argues that the Court should not dismiss any of plaintiff's claims under the NYSHRL, NYCHRL, and NYLL because defendant's personnel manual contains a "choice-of-law provision."  (Pl.'s Resp. at 11).  Plaintiff quotes this provision of the personnel manual in his Amended Complaint (<u>see</u> Am. Compl. ¶ 120), and defendant provided the Court with a copy of the relevant excerpt of the personnel manual.  (ECF No. 38).  The Court may consider the relevant portion of the manual as it was a document incorporated by reference in plaintiff's Amended Complaint and then provided to the Court by defendant.  <u>See</u> <u>Cortec Indus., Inc. v. Sum Holding L.P.</u>, 949 F.2d at 47–48.

The excerpt of the personnel manual provided to the Court is titled:  "16. Policy Differences for Employees Who Work in States Other Than New York," and appears to begin on page 153 of the larger manual.  (ECF No. 38-1).  It provides that:

> There are some areas where law provides additional benefits or protections, and these are described below. If you work in another state and do not see any exceptions for your state listed below, this is because Vera has decided, where other states' or cities' laws are *less* protective than New York law, to extend New York treatment to staff.

(<u>Id.</u>)  The excerpt then proceeds to detail the different leave policies and benefits applicable to employees working in California, D.C., and Louisiana.  Defendant argues that this provision is

"[f]ar from a choice-of-law provision applying to all aspects of employment" and instead "is solely intended to apply to leave periods."  (Reply at 8).

The Court agrees that this provision is not a standard choice-of-law provision.  A standard provision might indicate that the terms of an employment agreement or claims arising out of such an agreement are to be governed by New York law.  See, e.g., Warman v. American Nat'l Standards Inst., No. 15 CV 5486, 2016 WL 3676681, at *3 (S.D.N.Y July 6, 2016) (discussing a choice-of-law provision that reads "[t]his Agreement shall be governed by the laws of the State of New York, exclusive of New York's conflict of interest rules").  Courts that have considered a choice-of-law provision when analyzing whether a nonresident plaintiff is entitled to the protections of the NYSHRL and NYCHRL have continued to analyze the question based on the application of the impact analysis.  See, e.g., Pedroza v. Ralph Lauren Corp., 2020 WL 4273988, at *3, 5 (rejecting plaintiff's argument that she could demonstrate impact in New York based on defendant's selection of New York "as its choice-of-law in its severance agreement" because she "provide[d] no case law to suggest that these facts are sufficient to establish an impact in New York during her tenure with [defendant], or in connection with her termination").

The provision at issue here, however, does not purport to subject all disputes arising under the agreement to New York law, but instead it seems to bind defendant "to extend New York treatment to staff."  It is not clear to the Court what that entails.  More specifically, the Court has been provided little, if any, information about the purpose of this provision, how defendant has interpreted and applied this provision, or the kind of treatment or scope of New York treatment that defendant purports to extend to its staff.  Mindful of the fact that the Court does not have the entire personnel manual before it and that ambiguities in a contract are

36

typically construed against the drafter,[22] the Court cannot opine on the nature of this provision and what its effects would be on plaintiff's NYSHRL, NYCHRL, and NYLL claims.  If plaintiff were able to establish that defendants intended to waive the statutory requirements of impact and territorial scope that inhibit plaintiff's NYSHRL, NYCHRL, and NYLL claims, then perhaps plaintiff would be entitled to pursue such claims here.[23]  At this time, in the absence of any factual allegations suggesting that this provision was intended to waive the need for an impact analysis under the NYSHRL, NYCHRL and NYLL, the Court respectfully recommends that, as set forth <u>supra</u>, defendant's motion to dismiss Counts 5, 6, 8, 9, 10, 13, 14, and 16 be granted.  However, the Court further recommends that plaintiff be permitted to conduct discovery into the personnel manual and this provision.

CONCLUSION

Having reviewed the Amended Complaint and the parties' respective papers,[24]  the Court respectfully recommends that the defendant's motion to dismiss be denied as to Counts 2 and 3.  It is further recommended that the motion to dismiss be granted, without prejudice, as to Counts 5, 6, 8, 9, 10, 13, 14, and 16, and that, in light of plaintiff's *pro se* status, that plaintiff be given a further opportunity to amend.  Additionally, the Court respectfully recommends that the parties be given leave to conduct discovery into the personnel manual provision and, if appropriate, brief

---

[22] If a court concludes that a contract provision is ambiguous and if there is no extrinsic evidence that might shed light on the parties' intent with respect to that provision, "New York law provides that ambiguities must be construed against the drafter."  Aircraft Servs. Resales LLC v. Oceanic Capital Co., Ltd., No. 09 CV 8129, 2013 WL 4400453, at *4 (S.D.N.Y. Aug. 14, 2013), aff'd, 586 F. App'x 761 (2d Cir. 2014) (summary order).

[23] As the issue is not fully briefed before the Court, the Court does not opine on whether defendants could waive such statutory requirements to allow plaintiff to bring claims under the NYSHRL, NYCHRL, and NYLL.

[24] In plaintiff's opposition to the motion to dismiss, plaintiff also argues that the Court has diversity jurisdiction over the state law claims at issue and that the administrative dismissal of his SDHR complaints allowed him to "avoid the elections-of-remedies bar."  (Pl.'s Resp. at 3–5).  While defendant does not dispute plaintiff's arguments for purposes of the instant motion, these arguments do not respond to any of the arguments made in defendant's motion to dismiss, (Reply at 1 n.1), and have no relevance to the impact analysis central to this Court's recommendation.  Therefore, the Court has not addressed these extraneous arguments.

whether such a provision should be interpreted to allow plaintiff to bring his NYSHRL, NYCHRL, and NYLL claims without meeting all statutory prerequisites.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); see also Fed. R. Civ. P. 6(a) (providing the method for computing time).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  See, e.g., Caidor v. Onondaga Cnty., 517 F.3d 601, 604 (2d Cir. 2008).

The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
      August 11, 2023

*Cheryl L. Pollak*
Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York